J-A08027-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.-Y.B.N.S.-G., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.S., MOTHER | : : : : : | |
| | : | No. 2065 EDA 2020 |

Appeal from the Order Entered September 30, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000774-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.S.-G., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.S., MOTHER | : : : : | |
| | : | No. 2066 EDA 2020 |

Appeal from the Decree and Order Entered September 30, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001387-2017

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.:                    **FILED: APRIL 26, 2021**

T.S. (Mother) appeals from the decree involuntarily terminating her
parental rights to her daughter, Z.-Y.B.N.S.-G., a/k/a Z.S.-G. (Child), born in

---

* Former Justice specially assigned to the Superior Court.

May 2005.  Mother also appeals from the permanency review order changing Child's permanency goal from reunification to adoption.[1]  We affirm.

The record reveals Child was adjudicated dependent on June 1, 2017, as a result of Mother's illegal drug use.  The court placed Child in temporary legal and physical custody with her adult brother, D.S., with whom she had been residing for approximately one month.  Order of Adjudication Disposition, 6/1/17; N.T., 9/30/20, at 12-13.  The court also placed Child under the supervision of the Philadelphia Department of Human Services (DHS).[2]  Order of Adjudication Disposition, 6/1/17.

To meet the goal of reunification, the court directed Mother to:  obtain a dual diagnosis assessment and follow recommendations; comply with court-ordered random drug screens; participate in a parenting program and housing program through the Achieving Reunification Center (ARC); participate in domestic violence classes at Lutheran Settlement House; and attend weekly supervised visits with Child.  N.T., 9/30/20, at 14-15, 22.  Further, on January

---

[1] Child's father, W.G., voluntarily relinquished his parental rights, and the court confirmed his consent to adoption by order dated July 10, 2020.  Trial Court Opinion, 11/18/20, at 1, n.1.  W.G. did not appeal.

[2] By permanency review order dated September 19, 2018, the court discharged DHS supervision and vacated the order granting temporary legal custody to Child's adult brother.  The court transferred legal custody of Child to DHS and placed her in kinship foster care with the adult brother. Permanency Review Order, 9/19/18.

17, 2019, the trial court ordered Mother to obtain a parenting capacity evaluation. *Id.* at 22.

On October 16, 2019, DHS filed a petition for involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and a petition for goal change to adoption. On September 30, 2020, the court held a videoconference hearing on both petitions. DHS presented the testimony of Kelly Siebert, the family caseworker throughout DHS involvement, and Child, who was 15 years old at the time.[3] DHS also introduced, and the court admitted into evidence, certified criminal dockets revealing multiple charges filed against Mother in 1993 for crimes related to involuntary deviate sexual intercourse and corruption of minors against her two older daughters when they were six years old. N.T., 9/30/20, at 24, 30; Trial Court Opinion, 11/18/20, Exhibit D. Mother testified on her own behalf.

Ms. Siebert testified regarding Mother's history of drug and alcohol abuse as follows:

[I]n August 2017, Mother attended Merakey [treatment center] for cocaine use disorder. [Mother] also tested positive for PCP [phencyclidine] there.

[Mother] had reported that she had been using cocaine for 22 years, and she was spending $200 a day on cocaine. She was discharged on 10/30/2017 for noncompliance in attending, and they marked her prognosis as poor.

---

[3] Child's legal interests were represented by Susan Rubinovitz, Esquire, and Child's best interests were represented by guardian *ad litem* (GAL), Tracey Coleman, Esquire.

Then she went back to Merakey on 1/18/2018. She was diagnosed with a cocaine and alcohol use disorder. She was discharged on February 16, 2018, and they stated she has a history of AWOL [absence without leave] from [the] program. She attended one group, and she had a poor prognosis.

They also said that [Mother's] drug[s] of choice w[ere] marijuana, alcohol, cocaine, [benzodiazepines] and opiates. At that point, she had a 23-year cocaine history and a 34-year history of alcohol use, classified as severe.

On 12/31/2018, she went to Kirkbride [treatment center]. . . . [T]hey diagnosed her with an opiate use disorder, cocaine use disorder, alcohol use disorder, and [benzodiazepine] use disorder.

At the time, she was reportedly spending between [$]50 to [$]70 daily on her drugs of choice. She was discharged on 1/30/2019. That was listed [a] successful discharge. They had referred her to . . . outpatient [treatment].

[Mother] went back to Merakey on March 12, 2019. She was discharged on October 16, 2019 because she went AWOL, stopped going. . . .

N.T., 9/30/20, at 17-18. Ms. Siebert testified that in 80% of her interactions with Mother throughout the case, Mother was "high." *Id.* at 37-38.

Additionally, Ms. Siebert testified Mother minimally complied with her case plan objectives. N.T., 9/30/20, at 23. Mother completed parenting and housing programs through ARC, but failed to complete a parenting evaluation. *Id.* at 20, 22. Although Mother completed "couples therapy", she did not complete domestic violence counseling as ordered by the court. *Id.* at 22. Moreover, subsequent to her unsuccessful discharge from drug and alcohol treatment on October 16, 2019, she did not participate in any drug and alcohol or mental health treatment program. *Id.* at 20.

- 4 -

With respect to supervised visitation with Child, Ms. Siebert testified that three visits were scheduled in August 2017, but Mother cancelled all of them. *Id.* at 21. Child requested a visit with Mother around May 2018. *Id.* Child requested the visit to tell Mother "she wants absolutely no contact with her. . . . about how her mother used to beat her, and that's why she didn't want to go back to her mother." *Id.* at 33. However, Mother arrived 45 minutes late to the visit, and the visit was canceled. *Id.* at 21, 33-34. Child has not wanted to visit with Mother since. *Id.* at 21. Therefore, Child has not seen Mother except at dependency court hearings. *Id.* at 22. Child testified she wants to be adopted by her brother. *Id.* at 49.

By decree dated and entered on September 30, 2020, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). By order dated and entered on September 30, 2020, the court changed Child's permanency goal to adoption.

On October 30, 2020, Mother filed separate notices of appeal from the involuntary termination decree and goal change order, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. On November 18, 2020, the trial court issued an opinion pursuant to Rule 1925(a), in which it referenced its explanation on the record at the conclusion of the September 30, 2020 hearing.

On appeal, Mother raises the following issues:

1.   Whether the trial court committed error by involuntarily terminating [Mother]'s parental rights where such determination was not supported by clear and convincing evidence establishing grounds for termination under the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8)?

2.   Whether the trial court committed error by changing [Child]'s permanency goal from reunification with the parent to adoption without giving primary consideration to the developmental, physical and emotional needs and welfare of [C]hild as required by the Adoption Act, 23 Pa.C.S.A. §§ 2511(b)?

Mother's Brief at 9.[4]

We begin by recognizing:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

_____

[4] In her second issue and throughout her brief, Mother conflates the court's goal change with the needs and welfare analysis relevant to termination prescribed by Section 2511(b). Mother does not develop an argument with regard to goal change. Therefore, we do not review it. *See, e.g., Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's Statement of Questions Involved is deemed waived); Pa.R.A.P. 2116(a).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). In this case, we find the certified record supports termination under Section 2511(a)(2) and (b).[5] Pertinently:

**(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

---

[5] Based on this finding, we need not address Mother's claims regarding Section 2511(a)(1), (5), and (8).

- 7 -

. . .

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

This Court has explained that the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Section 2511(a)(2) requires a parent to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.* 797 A.2d 326, 340 (Pa. Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* Further,

grounds for termination under Section 2511(a)(2) due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; rather, grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

With respect to Section 2511(b), this Court has stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008) (citation omitted).

Mother argues with respect to Section 2511(a)(2) that DHS failed to prove by clear and convincing evidence that she "has parenting incapacity issues, or that she refuses to desire to parent and care for [Child]." Mother's Brief at 29. Mother also asserts she completed the required housing and parental objectives through ARC. *Id.* Mother states the housing objective was for her "to acquire suitable housing for herself and [Child], which was the primary reason for DHS placing the child in 2017. At the time of trial on

September 30, 2020, [Mother] had secured proper housing for herself and her husband with whom she lives and has maintained such for two years since 2018. . . .” *Id.*

First, we note that Mother's lack of suitable housing was not the primary reason for Child's placement. When DHS visited Mother's home on May 9, 2017, “[t]he home was appropriate except for the lack of hot water, which is reportedly being attended to.” Dependency Petition, 5/22/17, at ¶ 5(h); *see also* Order of Adjudication and Disposition, 6/1/17 (stating that parties stipulated to facts alleged). Rather than unsuitable housing, the record reveals Child was adjudicated dependent because Mother admitted to ongoing drug use in the home. Dependency Petition, 5/22/17, at ¶5(h). Also, DHS received a report of domestic violence in the home. *Id.* at ¶ 5(b). It was alleged that on April 29, 2017, when Child's brother attempted to pick up Child for the weekend, Mother and/or her husband threw a hammer through the brother's car window, and Mother tried to pull Child out of the car. *Id.* On May 3, 2017, Mother admitted to DHS there had been a “violent altercation” between her and Child's brother. *Id.* at ¶5(e); N.T., 9/30/20, at 12.

Ms. Siebert, the DHS caseworker, testified that Mother minimally complied with her case plan objectives, and made no progress in alleviating the circumstances that caused Child's placement. N.T., 9/30/20, at 23. For example, Mother was unsuccessfully discharged from drug and alcohol

treatment on October 16, 2019, and has not received treatment since that time. *Id.* at 20.

Mother testified she had been "clean" from illegal substances for five or six months, and she did so without receiving treatment. *Id.* at 55. Mother also testified she has "bipolar disorder." *Id.* at 72. She stated she last saw a psychiatrist "over a year" ago, and "I need to get into mental health care again . . . so I can get proper medication." *Id.* at 73-74.

Further, Mother did not participate in domestic violence counseling as ordered, and she failed to participate in a parenting capacity evaluation. *Id.* at 20, 22. Finally, Mother failed to attend scheduled visitation, which resulted in Child not seeing Mother during Child's three years of dependency. *Id.* at 21-22.

Based on our thorough review, we conclude DHS proved by clear and convincing evidence that Mother's repeated and continued incapacity, abuse, neglect or refusal caused Child to be without essential parental care, control or subsistence necessary for her physical or mental well-being. In addition, the evidence demonstrates that the causes of Mother's incapacity, abuse, neglect or refusal cannot or will not be remedied. As such, we discern no abuse of discretion by the trial court in finding grounds for termination under Section 2511(a)(2).

Next, Mother argues DHS failed to satisfy its burden of proof because it did not present expert evidence regarding what effect, if any, terminating

Mother's parental rights would have on Child. In acknowledging "discord" in her relationship with Child, Mother baldly asserts that DHS failed to provide family therapy for her and Child, which she stated she requested "over several years." Mother's Brief at 33; *see also* N.T., 9/30/20, at 68 (Mother testifying she requested family counseling "over and over again, several times"). Mother asserts, in essence, that DHS failed to make reasonable efforts at reunification.

This Court has stated that when evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). We are also mindful that:

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010).

Our Supreme Court has stated, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Supreme Court directed that in weighing the bond considerations of Section 2511(b), "courts must keep the ticking clock

of childhood ever in mind." *Id.* at 269. The Court observed that children "are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Instantly, there is no evidence that Mother and Child share a parent-child bond, and it was therefore reasonable for the trial court to infer that none existed. *In re K.Z.S.*, 946 A.2d at 762-763. Ms. Siebert, the DHS caseworker for the entire three years of Child's dependency, testified Child "doesn't have a relationship with her mother." N.T., 9/30/20, at 26. Ms. Siebert responded to the following questions on direct examination:

Q. If the [c]ourt were to involuntarily terminate [M]other's rights, would this cause [Child] any irreparable harm?

A. Not at all. That's what —

Q. — okay. And why not? Why wouldn't it cause any irreparable harm?

A. Because [Child] has not wanted contact with her mother[.] [Child] doesn't want to see her mother[.] [Child] does not have a relationship with her mother, and [Child] wants to be adopted by her brother.

*Id.* at 26-27.

Ms. Siebert stated Child "has a good relationship" with her adult brother, with whom she resides in kinship care, and is a pre-adoptive placement. *Id.* at 25. She testified, "I wouldn't necessarily say it's like a sibling relationship, but I would say it's more of a parent relationship." *Id.*; *see also id.* at 49 (Child testifying she wants to remain with her brother and would like him to

- 13 -

adopt her). Based on Ms. Siebert's testimony, we discern no abuse of discretion by the court in concluding that terminating Mother's parental rights serves Child's developmental, physical, and emotional needs and welfare pursuant to Section 2511(b).

Finally, we disagree with Mother's claim that the court abused its discretion in involuntarily terminating her parental rights where DHS failed to provide reasonable efforts to reunify her and Child by not providing family therapy. There is no evidence, other than Mother's self-serving testimony, which the trial court was free to reject, that Mother requested family therapy. Even if Mother requested it, and/or DHS should have and/or failed to provide it, this claim fails. We have explained:

> In **In re D.C.D.**, 105 A.3d 662 (Pa. 2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child. . . .

**In re Adoption of C.J.P.**, 114 A.3d 1046, 1055 (Pa. Super. 2015) (some citations omitted). Therefore, Mother's claim regarding reunification efforts does not merit relief.

For the above reasons, we affirm the trial court.

Decree affirmed. Order affirmed.

- 14 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>4/26/21</u>